UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RODNEY C. MOORE,

                    Plaintiff,

                                                    Case No. 17-cv-122-pp

          v.

DAN CROMWELL,

                    Defendant.

**ORDER DENYING AS UNNECESSARY PLAINTIFF'S MOTION TO FILE RESPONSE (DKT. NO. 92), DENYING PLAINTIFF'S MOTIONS TO COMPEL (DKT. NOS. 93, 112), DENYING PLAINTIFF'S MOTION FOR DISCOVERY (DKT. NO. 96), DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 107), GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 98) AND DISMISSING CASE**

On January 26, 2017, the plaintiff, representing himself, filed this lawsuit under 42 U.S.C. §1983, alleging that the defendants violated his constitutional rights. Dkt. No. 1. The court allowed the plaintiff to amend his complaint and to proceed on an Eighth Amendment conditions-of-confinement claim about the prison lighting and a First Amendment retaliation claim against defendant Cromwell. Dkt. No. 41. The parties filed cross-motions for summary judgment. Dkt. Nos. 98, 107. The plaintiff also has filed several other motions: a motion to file a response to the defendants' answer to the amended complaint, dkt. no. 92; two motions to compel discovery, dkt. nos. 93, 112; and a motion entitled "Motion for Discovery," dkt. no. 96. This order resolves those motions, denies the plaintiff's motion

for summary judgment, grants the defendants' motion for summary judgment and dismisses the case.

## I.     MOTION TO FILE A RESPONSE TO DEFENDANTS' ANSWER TO AMENDED COMPLAINT (DKT NO. 92)

In a December 4, 2018 order, the court ordered the clerk of court to substitute for the "John Doe" placeholders the names of the prison staff members whom the plaintiff had identified through discovery. Dkt. No. 83 at 3. The court ordered these new defendants to answer or otherwise respond to the complaint within sixty days of receiving electronic notice of its order. Id. at 5. The defendants answered on February 1, 2019. Dkt. No. 91. Ten days later, the plaintiff filed a motion entitled "Permission to file response to states [*sic*] response to John Does of Doc 27 complaint, and Response." Dkt. No. 92.  The court will construe this motion as a motion asking the court to give the plaintiff permission to reply to the new defendants' answer.

Federal Rule of Civil Procedure (7)(a) provides for a complaint, an answer and "(7) if the court orders one, a reply to an answer." In other words, a plaintiff does not have an automatic right to reply to an answer; he must have the court's permission to file a reply. It is rare for a court to give a plaintiff permission to file a reply to an answer. This is because Fed. R. Civ. P. 8(b)(6) provides that in situations where the rules don't require a reply, the court just assumes that the party against whom the pleading is filed opposes it. It was not necessary for the plaintiff to reply to the defendants' answer, which is why the court did not order him to do so and why the court will deny his motion for leave to file the reply.

## II.  MOTIONS TO COMPEL (DKT NOS. 93, 112) AND MOTION FOR DISCOVERY (DKT. NO. 96).

The plaintiff has filed three motions related to the defendants' alleged refusal to provide two items that he requested in discovery. To resolve the motions, it is helpful to understand the plaintiff's claims. The plaintiff alleged in his amended complaint that during his years at Green Bay Correctional Institution, he had little exposure to natural sunlight. Dkt. No. 41 at 2. He alleged that he was housed in the general population, not in segregation, but that at some point, he was "hit with a spot light that never seemed to shut off." Id. (quoting Dkt. No. 27 at 4). He alleged that he suffered eye damage, migraines and nausea due to being exposed to this light for several months. Id. at 3. He described the light as a 250-watt bulb with a magnifying lens. Id.

In a motion received by the court in March 2019, the plaintiff asked for inmate complaints filed by "his witnesses Kevin Moore and Shannon Rogers," indicating that those complaints would support his assertions that the prison staff unlawfully used lights. Dkt. No. 93 at 1. The discovery request indicates that Moore and Rogers were inmates whom the plaintiff believed also had filed complaints about the lights. Dkt. No. 111-1 at 1. At the time they received the discovery demand, the defendants had objected to it as vague and overly broad, alleging that it sought irrelevant information and that it sought records that were restricted or confidential for security reasons. Id.

In the same motion, the plaintiff asked the court to compel the defendants to provide him with a copy of Howard Ray's report from April 2018, indicating that Ray "was to be a witness." Dkt. No. 93 at 1. The defendants had

responded to that demand by asserting that they weren't able to identify Howard Ray or find any documents that responded to this request; they invited the plaintiff to clarify the request. Dkt. No. 111-1 at 2.

The defendants objected to the plaintiff's March 2019 motion to compel, arguing that the plaintiff had not complied with Fed. R. Civ. P. 37(a)(1), which requires a party who files a motion to compel to include with the motion a certification that the moving part has, in good faith, conferred or attempted to confer with the other side in an effort to obtain the discovery without involving the court. Dkt. No. 94.

Rather than providing the court with the certification required by Rule 37, the plaintiff filed a "Motion to Enforce Discovery and a Motion to Order OSHA to Investigate." Dkt. No. 96. This motion stated that during his April 18, 2019 deposition, the plaintiff "clearly stated to defense counsel that Mr. K. Moore and Mr. S. Rogers in fact filed [inmate complaints] about the wall lights and there lasting effect and these documents are eccential to this law suit seeing the Dept. of Safety and Professional Services never investigated, only by phone call, and the may light was never investigated." Id. at 1. He also told the court that Howard Rays was "from Maryland Dept. of Public Safety and Correctional Services," and that Ray "and company" had investigated "everything" at Green Bay Correctional, had given interviews to "every other prisoner" and had investigated prison rape complaints. Id. at 2. He asked the court to order the defendants to turn over the documents he'd requested "and

extend discovery only for OSHA investigation ordered by court, if you will." Id. at 4. The defendants did not respond to this motion.

After both parties filed summary judgment motions, the plaintiff filed another motion to compel, which the court received on July 19, 2019. Dkt. No. 112. This motion again asked the court to require the defendants to turn over a "full unsensored copy of Mr. Howard Rays report from April 18 or to order Mr. Howard Ray to turn this report over to the plaintiff." Id. at 1. It also asked for "all [inmate complaints] filed against the wall lights from Dec 2016 to Dec 2018," and "an order compelling Kevin Moore to turn over his declaration to his [inmate complaint] he filed, he may be a hostial witness since Rodney Moore is no longer at GBCI." Id. at 1-2. The plaintiff reminded the court that this was his "3rd or 4th request for these documents." Id. at 2.

The defendants responded only to the plaintiff's demand for Mr. Ray's report. Dkt. No. 114. They asserted—incorrectly—that the plaintiff had demanded "what he terms an 'OSHA report' by Howard Ray from April 2018." Id. at 1. (The plaintiff did not call Ray's report an "OSHA" report.) They indicated that a search of their records had not revealed any OSHA investigation into lighting issues at Green Bay Correctional.[1] Id. at 1. It appears that the defendants were able to identify Ray, however; the defendants explained that in April 2018, Howard Ray had visited Green Bay for three days "to conduct a site audit to ensure that the institution was complying with PREA

---

[1] It appears to the court that the plaintiff was asking the court to order OSHA to start an investigation, not that he was alleging that Ray had participated in an OSHA investigation.

[Prison Rape Elimination Act] standards." Id. at 2. The defendants stated that as part of that audit, one prisoner from each housing unit was selected at random to be interviewed by the auditors. Id. The defendants believe that Kevin Moore—one of the inmates whose inmate complaints the plaintiff had requested—may have been one of those randomly-selected inmates. Id. They asserted, however, that the fact that Moore may have been interviewed regarding the institution's compliance with PREA standards did not make Ray's report on PREA compliance relevant to a lawsuit about the use of the wall lights in the prison.[2] Id.

Fed. R. Civ. P. 26(b)(1) states that "[p]arties may obtain discovery regarding any nonprivileged matter that is *relevant* to any party's claim or defense and proportional to the needs of the case." (Emphasis added.) The plaintiff claims that his constitutional right to be protected from unconstitutional conditions of confinement was violated when he was subjected to prolonged exposure to, and injured by, powerful wall lights, and that one of the defendants retaliated against him when he complained about that condition of confinement. As discussed below, the defendants don't

---

[2] The plaintiff may be aware that Ray was investigating PREA compliance, and may have asked for Ray's report in connection with his allegation that one of the defendants retaliated against him for complaining about the wall lights by "allowing" him to receive a disciplinary ticket that "caused [the plaintiff] to be sexually harassed by this person to the point [the plaintiff] filed a [PREA] complaint . . . ." Dkt. No. 27 at 4. But the court did not allow the plaintiff to proceed on claims relating to the prison's compliance, or lack of compliance, with the PREA.

dispute the use of the wall lights. The issue is whether the defendants' use of the wall lights constitutes and unconstitutional condition of confinement.

The plaintiff appears to want inmate complaints filed by other inmates to show that those other inmates also were subjected to the wall lights and suffered as a result. Because the defendants do not dispute the use of the wall lights, however, the plaintiff does not need corroboration from other inmates to prove it. The defendants have represented that Mr. Ray's report is not related to the lights, but involves an investigation into whether Green Bay was compliant with PREA requirements. Neither the inmate complaints nor Ray's report are relevant to the question of whether the plaintiff was subjected to unconstitutional conditions of confinement.

Even if there were relevant information either in the inmate complaints or Ray's report, the court would deny the plaintiffs' motions because he did not comply with Fed. R. Civ. P. 37. The plaintiff did not attach a "meet and confer" certification to his first motion. Telling opposing counsel at a deposition that other inmates complained about the lights does *not* constitute a good-faith effort to try to work out discovery disputes without involving the court.[3] To date, the plaintiff has not provided the court with certification that he tried, in good faith, to work out his differences with opposing counsel before filing his motions to compel. The court will deny the motions.

---

[3] The plaintiff asserted in his declaration that he told defense counsel who the witnesses were and that he was "still unable to reach them for the declaration." Dkt. No. 108 at 2.

As to the plaintiff's request that the court order OSHA to investigate the use of wall lights, the court does not have the authority to grant injunctive relief against a non-party under these circumstances.

### III.  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 107)

A.  Plaintiff's Failure to Comply with Procedural Rules

The plaintiff did not follow Fed. R. Civ. P. 56 or Civil L.R. 56 in filing either his summary judgment motion or his response to the defendants' summary judgment motion. Much of the plaintiff's nine-page motion for summary judgment rehashes his discovery demands and his disagreement with the defendants' responses to those demands. Dkt. No. 107 at 1-4. While the motion referred to certain exhibits, the plaintiff did not comply with Civ. L.R. 56(b)(1)(C), which required him to file a statement of proposed material, undisputed facts that he believes entitle him to judgment as a matter of law. He did not sign or date his motion. Dkt. No. 107 at 9. The declaration he filed in support of the motion makes no reference to 28 U.S.C. §1746, and the plaintiff did not use the language of that statute in certifying the truth of the declaration. In his opposition to the defendants' motion for summary judgment (which he called a "consolidated brief" in support of both his motion for summary judgment and his opposition to the defendants' motion for summary judgment), the plaintiff failed to respond to the defendants' proposed findings of fact, as required by Civil L.R. 56(b)(2)(C).[4]

---

[4] The plaintiff has filed three documents that he calls "briefs," and which contain legal arguments. Dkt. Nos. 107, 110 and 111.

District courts, however, are to construe *pro se* submissions leniently, may overlook the plaintiff's noncompliance with a local rule and may construe whatever limited evidence the plaintiff presents in the light most favorable to the plaintiff. See Gray v. Hardy, 826 F.3d 1000, 1005 (7th Cir. 2016). While the court recognizes that the plaintiff's filings do not comply with the rules, it finds that there is enough evidence for the court to analyze the summary judgment motions. The court has the plaintiff's motion (dkt. no. 107), his exhibits (including a report from the DOC optometric department, a letter from the Warden verifying that the plaintiff had filed complaints about the lights and stating that the lights had to remain on for safety and security of staff and inmates, a history of the plaintiff's bed assignments, a work assignment order for the plaintiff, information about the plaintiff's educational efforts, a letter from a fellow inmate who said the plaintiff was working in the Waupun kitchen in 2011 and 2012, copies of the kitchen schedule and diagrams showing the location of the light in relation to the plaintiff's cell, photos of the light, medical records and other evidence, dkt. no. 107-1), and his declaration (dkt. no. 108). It also has the exhibits he attached to his opposition brief to the defendants' motion (dkt. no. 110-1) and various documents related to the plaintiff's assertion that he didn't receive the discovery he'd demanded (dkt. no. 111-1). Finally, the plaintiff submitted an amended complaint declaring under penalty of perjury that the facts in it were true and correct. Dkt. No. 27. This is enough to convert the amended complaint into an affidavit for purposes of summary judgment. See Beal v. Beller, 847 F.3d 897, 901 (7th Cir. 2017); Owens v.

Hinsley, 635 F.3d 950, 954-55 (7th Cir. 2011). The court also has the benefit of the plaintiff's deposition transcript (dkt. no. 106-1, submitted with the declaration of one member of the defense team), which is a sworn statement. The court notes, though, that where the plaintiff's limited evidence fails to address the defendants' findings of fact due to the plaintiff's failure to comply with Civil L. R. 56, the court may consider the defendants' facts undisputed under Civil L.R. 56(b)(4).

B.     Plaintiff's Request for Summary Judgment as a Sanction

The plaintiff's motion asks the court to grant summary judgment in his favor under Fed. R. Civ. P. 56(h), as a sanction for two alleged incidents of misconduct. First, he asserts that the defendants failed to provide him with Ray's April 2018 report. Second, he claims that Institute Complaint Examiner Alan DeGroot committed perjury in his declaration (dkt. no. 101) and appended falsified cell assignment records to the declaration. Dkt. No. 107 at 1-2, 5-6.

The court already has concluded that Ray's report on PREA compliance is irrelevant to the plaintiff's claim of unconstitutional conditions of confinement. Because the defendants were not required to produce Ray's report, the court will not sanction them for failing to produce it.

The plaintiff claims that DeGroot perjured himself in his declaration by stating that "no kitchen workers lived in Dorm A at GBCI;" the plaintiff insists that "documents from clerks in GBCI" indicate otherwise. Id. at 6. The plaintiff also asserts "Def Exh 1001-002, 001, Bed assignment + prison status for working, school or not doing anything" constitutes "false paperwork filed by

defendants in an attempt to discredit plaintiff." Id. at 5. Under Fed. R. Civ. P. 56(h), if the court is "satisfied that an affidavit or declaration is submitted in bad faith or solely for delay," the court " after notice and a reasonable time to respond . . . may order the submitting party to pay the other party the reasonable expenses . . . it incurred as a result" or otherwise appropriately sanction the submitting party.

DeGroot is not a defendant. In support of their motion for summary judgment, the defendants filed an affidavit from DeGroot, attesting to the authenticity of several exhibits, including an excerpt from the prisoner handbook about cell hall living rules, photos DeGroot had taken of wall lights, the plaintiff's "Special Handling Summary" showing that he had no tier restrictions, a copy of the plaintiff's bed assignment list and copies of the plaintiff's inmate complaints. Dkt. No. 101. The declaration is three pages long, contains twelve paragraphs, and DeGroot declared under penalty of perjury under 28 U.S.C. §1746 that it was correct. Id. Nowhere in this declaration does DeGroot state that "no kitchen workers lived in Dorm A at GBCI"—the statement the plaintiff claims is false. Nor can the court find that statement in any of the exhibits attached to DeGroot's declaration.

DeGroot attached to his declaration a document dated October 25, 2018, entitled "Bed Assignments." Dkt. No. 101-5. It appears to be a list of the plaintiff's cell assignments from July 15, 2016 through October 13, 2018. The document shows dates, times, the name of the facility, the housing unit, the

bed ID and a category titled "status."[5] Id. There are twenty entries on the document; one of these shows the plaintiff in "Assigned" status. The court doesn't know what "Assigned" status means. But the one entry shows that as of October 13, 2018, the plaintiff was in Housing Unit NO/_C, in Bed ID _C68/LO, when he was "Assigned." Id.

The plaintiff provided the court with an Inmate Work/Program Assignment/Placement form showing that on October 14, 2018 (the day after it appears that he got moved to NO/_C, Bed _C68/LO) the plaintiff went from a job description of "IUN"—"involuntary unassigned"—to being assigned to "kitchen FSWI." Dkt. No. 107-1 at 8. The plaintiff also filed a copy of the Kitchen Daily Schedule for November 26, 2018, which listed the plaintiff as living in cell C 68 and working the "extra west" assignment that day. Id. at 14. Finally, the plaintiff filed an unsworn letter from someone named Joseph Wyatt, who said that he worked with the plaintiff at *Waupun Correctional Institution* in 2011 and 2012, and stated, "this paper work stating he was unassigned is incorrect, Mr Moore was assigned to the kitchen at Waupun, I held a position as a clerk and processed his schedule for work everyday, and Mr Moore worked there for approx. 6 months or more." Id. at 13.

---

[5] The plaintiff provided this same document at Dkt. No. 107-1, page 6. He also provided his bed assignments from stays at Columbia Correctional (May 2009 through January 2010); an earlier stint at Green Bay (February 2010 through January 2011), Waupun Correctional (March 2011 through September 2012); and Oshkosh Correctional (May 2013 through July 2014). Dkt. No. 107-1 at 4-5, 7.

Other than the plaintiff, the only person who mentioned "Dorm A" and kitchen work is John Lannoye, a correctional sergeant at Green Bay; Lannoye is a defendant, and he also submitted a declaration. Dkt. No. 103. Paragraph 28 of Lannoye's declaration states that the plaintiff was moved to Dorm A on February 7, 2018, and that he stayed there until September 2018. Id. at ¶7. Lannoye indicates that the plaintiff was moved to the North Cell Hall in September 15, 2018, id. at ¶29, and was moved to a different cell in North Cell Hall on October 13, 2018 "because he was given [a] job in the North Cell Hall kitchen," id. at ¶30. None of the other individuals who provided declarations in support of the defendants' motion said anything about kitchen workers living (or not living) in Dorm A, and the defendants' proposed findings of fact (dkt. no. 100) do not say anything about kitchen workers living (or not living) in Dorm A. The court can't find any statement from DeGroot, or from anyone else, saying that there were no kitchen workers living in Dorm A.

The court is stymied by the plaintiff's assertion that DeGroot made a false statement in his declaration regarding kitchen workers living in Dorm A. There is no such statement in the declaration. The plaintiff was at *Green Bay Correctional* from October 3, 2014 to December 28, 2018 and has made claims that the *Green Bay* staff subjected him to unconstitutional conditions of confinement, so the court can't see the relevance of the unsworn statement from inmate Wyatt who worked with the plaintiff in the kitchen at Waupun in 2011 and 2012. It does appear that the plaintiff started working in the Green Bay kitchen on October 14, 2018 and that he was working there as of

13

November 26, 2018, and the bedding assignment sheet that DeGroot attached to his declaration appears—as best the court can understand it—to support that fact, as do DeGroot's and Lannoye's declarations. The court can't find any reference in any of the documents the plaintiff provided to "Dorm A," but the plaintiff explained in his summary judgment motion that "DRM is short for Dorm A living area." Dkt. No. 107 at 6. The kitchen assignment sheet the plaintiff provided from November 2018 shows two inmates in "DRM 38" and "DRM 76," but because DeGroot never said that no kitchen workers lived in Dorm A, the fact that those two workers lived in a housing unit called "Dorm A" is irrelevant. The court has no evidence that DeGroot perjured himself, in his declaration or anywhere else.

The plaintiff also asserted that Defense Exhibits 1001-1002 were "false paperwork." The defendants did not file an Exhibit 1001 or 1002. The one-page bedding assignment filed with DeGroot's declaration is marked Exhibit 1011. Even if the court assumes that Exhibit 1011 is the document the plaintiff claims is false, the court has no proof of that. As best the court can tell, the plaintiff is bothered by the fact that the bedding assignment sheet the defendants submitted (the same one *the plaintiff* submitted) shows that he was "unassigned" for chunks of 2016, 2017 and 2018. The court infers that "unassigned" meant that the plaintiff wasn't assigned to a prison job or school, and that the plaintiff objects to the implication that he was just sitting around doing nothing. The plaintiff says he has provided proof that he had a job starting October 13, 2018 and that "school started 8-6." Dkt. No. 107 at 5. This

appears to be why the plaintiff provided the court with evidence that in August 2016 he was taking classes in math and computer literacy (dkt. no. 107-1 at 10) and that he completed courses at Northeast Wisconsin Technical College in the fall of 2017 (dkt. no. 107-1 at 11-12). The court believes the plaintiff when he says that he went to school and worked while he was at Green Bay between 2014 and 2018. But those facts don't prove that the defendants submitted false paperwork, and nothing the plaintiff has submitted provides this court with a basis to impose sanctions on any of the defendants.

Finally, even if DeGroot *had* made a false statement about whether kitchen workers lived in Dorm A, or the defendants *had* falsely represented that the plaintiff wasn't working or going to school when he was, those facts are not relevant to the plaintiff's claim that the defendants deliberately exposed him to extreme light that caused him injury. It would be wrong for the defendants to submit false information (they did not), but the allegedly false information would not have been material to the plaintiff's claims.

The court will deny the plaintiff's motion for summary judgment.

## IV.     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 98)

### A.     Facts

#### 1.     *The Parties*

The plaintiff was incarcerated at Green Bay from October 3, 2014 until December 28, 2018. Dkt. 100 at ¶1. At that time, Daniel Cromwell was the Corrections Program Supervisor. Id. at ¶2. Defendants John Lannoye, Kyle Cook, Kurt Schierland and Michael Cole were Correctional Sergeants in the

South Hall. Id. at ¶¶3, 5, 10, 11. Defendant Toukao Yang was a Corrections Officer. Id. at ¶4. Defendant Steven Schueler was the Deputy Warden. Id. at ¶5. Defendant Timothy Retzlaff was a Supervising Officer I/Lieutenant in the South Cell Hall. Id.at ¶6. Defendants Daniel Cushing and Ryan Baumann were Supervising Officers II/Captains in the South Hall. Id. at ¶¶8-9.

2. *The Use of the Wall Lights*

In his November 2017 amended complaint, the plaintiff alleged that from late December 2016 through June 29, 2017, Cromwell allowed "security" to use "emergency wall lights" as everyday lights. Dkt. No. 27 at 3-4. He described the light as a "250 watt light w/magnifying lens in the south cell hall." Id. at 3, 7. He asserted that "the electrician" told him that "a 250 watt light bulb . . . here at GBCI is equal to a train high beam head light." Id. at 5. The plaintiff asserted that the light was the "same tactic as water boarding, which is illegal in the United States." Id. He explained that in the summer, the light was turned on at 6:00 a.m. and "shut off at 10:00 pm." Id. at 4. He stated that "now"—presumably as of early November 2017, when he signed his complaint—"it's on 2:00 to 5:00 pm—10:00 p." Id.

The complaint alleged that defendant Cromwell "left it up to the listed security officers to use these lights as they think they need them." Id. at 3. It asserted that defendant Lannoye "purposely shut[] of[f] ceiling lights before turning on wall lite," and that Lannoye told the plaintiff he didn't care if the lights gave the plaintiff migraines, "he said he would like as much light in here as he can get so by shut[t]ing off c[ei]ling lights he can use the wall lights." Id.

at 4. The complaint alleged that defendant Cook claimed to be following orders from Cromwell, and that Cromwell claimed it was up to security; the plaintiff said there were days when Cook "never turned the lights on" and that it "depended on who was working in the cage." <u>Id.</u> The complaint stated that defendant Yang said that Yang could see without "them"—presumably the wall lights—and that Yang first told the plaintiff it was Lannoye who ordered Yang to turn the lights on, but that Lannoye would say it was Yang. <u>Id.</u>

The plaintiff stated in the amended complaint that in January 2017, he "put a small piece of paper on [his] door to block the light from [his] eyes." <u>Id.</u> at 4. He says that this action caused Sgt. Rozmarynoski (no longer a defendant) to give him a conduct ticket. <u>Id.</u>

 The complaint stated that in February 2017, "an accommodation to another cell was made" to the plaintiff, but that he "had to decline, it was against a medical restriction at that time." <u>Id.</u> at 6. It indicated that at the time the plaintiff wrote the complaint, he was "in front of the other side, another light, up to 30 days ago it was fine, someone removed the paper in front of it that was blocking the light from hitting me, the headache's are back, the magnifying lens appears to be cleaned." <u>Id.</u> The plaintiff alleged that "Deputy Warden Schueler stated he will not direct the listed defendant's to do anything differently, thus allowing this 250 watt lights to be used as non-emergency use when ceiling lights are installed for that purpose." <u>Id.</u>

The plaintiff asserted that he wrote to the warden, that he tried to contact the Occupational Safety and Health Administration (OSHA) to have the

lights inspected but had not heard back, and that he had filed "a John Doe because these lights can cause other problems here." Id. at 6.

At his April 18, 2019 deposition, the plaintiff testified that after he was transferred from cell G17 to G57, he spoke to an electrician (whose name he did not know), who told him that "they're 250-watt light bulbs and that's all they can handle." Dt. No. 106-1 at 8, Tr. Pages 29-30. He testified that no one had told him that there was a magnifying lens on the light; he thought "that's on the glass and the proportion of it being twisted, turned. That's how you do magnifying glasses. It just made it brighter." Id. at Tr. Page 32. The plaintiff explained that he knew the light was like a train's high beam because he grew up in northern Wisconsin where there were lots of train tracks and trains, and that the trains had a single light in the center that was like the light at the prison. Id. at 9, Tr. Page 33.

The plaintiff testified that it was his understanding that the light started being used in December of 2016

> Because staff had walked past an inmate that had committed suicide on H Tier and they did not see him laying on the floor for more than eight hours. So because of that death, that suicide, they proposed to turn all the lights on inside the cell hall and to use the wall lights as extra lighting.

Id. at Tr. Page 34. The plaintiff testified that Lannoye and Schueler had told him that the "unit manager," whom the plaintiff identified as Cromwell, had made the decision to start using the light in December 2016. Id. at Tr. Page 35.

The plaintiff attested at the deposition that when staff first started using the lights, they were "only turning it on during medication time"—between 6:00

and 7:30 a.m. Id. He explained, however that at "Christmas break" in December 2016, "they turned them on at 6:00 in the morning and then left them on all night, all day long, and they didn't shut them off until between 10 and 10:30 at night." Id. The plaintiff said sometimes "they" left them on longer "because Security said they forgot to call Control and have them shut off." Id. at Tr. Pages 35-36. The plaintiff testified that he was in his cell all day on an average day, with the exception of recreation when he had it. Id. at 9-10, Tr. Pages 36-37.

At the deposition, the plaintiff testified that Lannoye, Yang, Cook and Schueler either turned on the lights, had the authority to turn on the lights or refused to turn off the lights; he also alleged that Lannoye laughed at him when the plaintiff asked Lannoye to turn the lights off. Id. at 16, Tr. Pages 61-63. The plaintiff asserted that Retzlaff "could override the decisions by the sergeants or the COs" and have them shut off the lights "but he never did that." Id. at 16, Tr. Pages 63-64. He testified that defendant Cushing told another staff member that "it was up to the person in the cage or it was up to the sergeant to shut the lights off," and that Cushing "refused to tell them to shut the lights off." Id. at 16-17, Tr. Pages 64-65. The plaintiff averred that Baumann was in charge of all the captains and lieutenants "and everybody underneath him," and that one day Baumann refused to tell the corrections officers and sergeants to turn off the lights after the plaintiff asked him to do so. Id. at 17, Tr. Pages 65-66. The plaintiff testified that Baumann said that "they" would shut off the lights when they were done with them. Id. at Tr. Page 66. The plaintiff testified that he had

19

"the same issue, wall lights" with Schierland. Id. The plaintiff attested that Cole laughed and told the plaintiff that Cole was doing what he was told to do by Schueler and Cromwell. Id. at Tr. Pages 66-67.

The defendants explained that between December 2016 and the end of 2018, the plaintiff was housed in various cells in the South cell hall.[6] Dkt. No. 100 at ¶¶12, 45. They indicated that in late 2016, someone directed the security staff in both North and South cell hall "to request the wall lights in the cell hall be turned on when there was low visibility due to inadequate lighting or in the cell hall." Id. at ¶¶13, 47. The defendants stated that while the general population units "are required" to have a certain amount of natural light, and that the North and South cell halls have big, frosted windows for that purpose, the time of day or the season may result in insufficient lighting, especially in stairwells and on catwalks. Id. at ¶¶14-15, 23, 49. The cell halls also had ceiling lights and "wall-mounted cannister lights." Id. at ¶50. Because the environment inside the cell halls was dark, "there were times when staff were mistaken for inmates, and the other way around." Id. at ¶52. The defendants asserted that the wall lights were used to "ensure staff and inmates could be identified accurately while on the tiers, as well as to allow other staff to monitor

---

[6] The plaintiff asserts that this was not true. He states that when he arrived at Green Bay in October 2014, he began in "NCH," and was moved to "SCH E-69" after about two weeks. Dkt. No. 108 at 1. He says that after another two weeks, he was given "a medical single cell," E-48, where he lived "until he was given a ticket for allegedly enterprising" (which the plaintiff says referred to the fact that he had a hobby of beading, and he'd send out the finished items). Id. The plaintiff says that when he was in cells E-48, E-37 and E-69, he didn't have any problems with the lights. Id. at 2.

for both inmate and staff safety."[7] Id. at ¶53. The defendants explained that the wall lights "are canister lights which are larger in diameter and have brighter illumination than the ceiling lights in the public areas of the cell hall." Id. at ¶55. They stated that the lights contain 300-watt bulbs, and that while they do not have a lens magnifier, they "have a diffuser lens that apparently acts to spread out and soften the lighting." Id. at ¶108.

The defendants maintained that the wall lights in the South cell hall are not emergency lights and are not on twenty-four hours a day; they are used in addition to the ceiling lights when needed for visibility. Id. at ¶¶16-17. They are not "emergency lights," and the defendants asserted that they are not "used in place of the ceiling lights in the public areas of the cell hall." Id. at ¶56. Staff members can ask for the wall lights to be turned on when visibility is low or the lighting is inadequate; in particular, officers doing security rounds on the catwalks could ask to have the wall lights turned on. Id. at ¶18. They indicated that "typically," the lights were turned on "in the early morning when inmate and staff movement begin," noting that morning medications are distributed at 6:00 a.m. Id. at ¶22. They "were to be primarily used when inmate and staff movement began in the morning and again in late afternoon and evening when the sun went down or natural lighting was insufficient." Id. at ¶48. See also id. at ¶26 ("The wall lights were typically turned on for late afternoon and evening

---

[7] The plaintiff stated in his declaration, "Staff used that mistaken identity for an excuse to turn those lights on, after [the plaintiff] went to the Dorm A, the staff stopped using the lights all day, reported by [the plaintiff's] witnesses." Dkt. No. 108 at 3.

movement in the cell hall such as medication distribution, movement for meals, recreation and library passes, health service and security rounds, and the final cell count of the day at 9:30 p.m. Some days, medication distribution would run past 9:30 p.m. Wall lights were typically turned off by the time Lannoye would leave work for the day at about 10:00 pm.")  The "choice of whether to turn on the wall lights was determined by individual security staff." Id. at ¶49.

### 3. *The Plaintiff's Alleged Injuries*

In his November 2017 amended complaint, the plaintiff asserted that Cromwell allowed the use of the wall lights every day "without checking on the potential harm they can do to any person staff or prisoner. Severe migraines w/naus[e]a also." Dkt. No. 27 at 3. He alleged that Lannoye told the plaintiff he did not care if the lights gave the plaintiff migraine headaches. Id. at 5. He stated that at the time he signed the complaint, the headaches were back. Id. at 6. Finally, the complaint asserted that the plaintiff had to wear tinted glasses indoors and out, and that he had headaches all the time, which still hurt after the lights were shut off. Id. at 8.

At his April 2018 deposition, the plaintiff testified that he suffered severe headaches "[w]henever they turned that light on," "[e]very time that light came on." Dkt. No. 106-1 at 11, Tr. Page 41. He stated that he filed numerous health services requests (HSRs)—maybe five or six—and that the staff at Green Bay "set [him] up with an eye doctor." Id. at Tr. Page 41. A "State" doctor conducted the exam, and "they" got him "tinted glasses" that were "State-issued." Id. At

the time of the deposition, the plaintiff said he was on a referral list to see another doctor at Green Bay because "things [weren't] getting any better." Id. at Tr. Page 43. The plaintiff testified that the appointment with the eye doctor took place on June 29, 2017. Id. Prior to that, the plaintiff was seen in the Health Services Unit in February 2017.[8] Id.

The plaintiff testified that the eye doctor told him he "was extremely sensitive to bright light." Id. at 11-12, Tr. Pages 44-45. He conceded, however, that he had not asked the eye doctor about the wall lights. Id. at 12, Tr. Page 45. The plaintiff testified that he did not suffer headaches prior to Christmas 2016. Id. The plaintiff stated that from December of 2016 through 2018, he bought Excedrin at the canteen, and that in 2018 the HSU staff gave him Excedrin. Id. at Tr. Pages 46-47. The plaintiff also testified that the migraine headaches "made [him] sick to [his] stomach, made [him] want to throw up." Id. at Tr. Page 47. Someone—possibly a doctor named Peters—prescribed the plaintiff Pepto Bismol for the nausea. Id. at Tr. Pages 47-48. No medical provider ever told the plaintiff that his nausea was caused by the wall lights. Id. at Tr. Page 48. The eye doctor did not tell the plaintiff that the wall light caused damage to his eyes. Id. at 13, Tr. Page 50.

The plaintiff testified that he'd worn glasses since he was a teenager, as needed for distance. Id. at Tr. page 51. He testified that as of the deposition

---

[8] Defense counsel asked the plaintiff at the deposition if he'd refused to be seen by HSU in February 2017. Dkt. No. 106-1 at 11, Tr. P. 43. The plaintiff first responded that he didn't recall ever refusing to be seen, then explained that it would have been because "they tried to charge me a co-pay." Id.

date, he had to wear sunglasses or "these"—possibly his state-issued glasses—to watch television. Id. at Tr. page 52. He testified that the tinted glasses helped with the wall light. Id. at 14, Tr. page 54.

In his June 2019 summary judgment motion, the plaintiff alleged that he had eye damage so bad that he could not go outside for long periods of time with his tinted glasses, and that if he doesn't have the glasses on, he can't open his eyes to see outside at all. Dkt. No. 107 at 4. He asserted that at "OSCI"—possibly Oshkosh Correctional—he was "outside in yard all the time without his glasses in sunlight and without sunlight with no problems, this was 2014."[9] Id. at 4. The plaintiff attached to his summary judgment motion a prescription. Dkt. No. 107-1. The court assumes it is for glasses; it is dated June 29, 2017, and bears the notation "30% grey." Id.

The defendants indicated that the plaintiff's "optical" records don't mention anything about him suffering disease or damage to his eyes as a result of exposure to bright lights "after December 2016." Dkt. No. 100 at ¶101. They say the records show that the plaintiff "was seen" on April 28, 2017 and June

_____

[9] The plaintiff spent several pages of his declaration explaining that when he arrived at Green Bay in 2014, the doctors took away all his medications, including Vitamin D and iron. Dkt. No. 108 at 2-3. He says that Vitamin D and iron "control your eyesite." Id. at 3. He says that while it "took from 2006 to 2012" to get his health in order, it took "one doctor 3 months to wipe out 6 years worth of the work," and that "[t]he eye's are still sensitive." Id. at 5. If the plaintiff is asserting that his health—including his eyesight—has been damaged by the medical treatment he received, or didn't receive, at Green Bay, this lawsuit is not the place to pursue that claim. The plaintiff did not sue the Green Bay medical staff for deliberate indifference to his serious medical needs. This suit relates only to his allegations that staff subjected him to the wall lights.

29, 2017 "for which he received glasses with a 30% grey tint." Id. at ¶102. According to the defendants, the plaintiff complained at these appointments of "photophobia"—light sensitivity. Id. at ¶103. The defendants also point out that the defendant had complained about migraine symptoms *before* December 2016. Id. at ¶104. The records show that on November 14, 2016, he reported migraines (for which he was taking Tylenol), and on November 17, 2016, he submitted an HSU request asking for medical ice for migraines. Id. at ¶¶104-105.

The defendants provided the court with the receipt for the plaintiff's glasses, with an order date of June 29, 2017 and the notation, "30% Grey Tint Per Dr. Order." Dkt. No. 105-1 at 4. They provided medical notes from November 14, 2016, which indicate, "[The plaintiff] has been using Tylenol on a daily basis due to headaches." Id. at 7. These notes stated that the plaintiff had reported symptoms of exposure to dust on the cell hall. Id. The defendants included the HSU request dated November 17, 2016, in which the plaintiff asked for "ice for migraine headach[e]s, discussed with RN Peters 11-14-16. She mentioned it." Id. at 8.

3. *The Plaintiff's Cell Assignments as a Potential Accommodation*

The defendants have indicated that they started using the wall lights in December 2016. The plaintiff filed his original complaint on January 27, 2017 and his amended complaint—the operative complaint—on November 27, 2017.

The bed assignment sheets the plaintiff submitted show that in December 2016, the plaintiff was in _G17/LO, in housing unit SO/_G (which

the court assumes refers to the South Cell Hall, tier G). Dkt. No. 107-1 at 6. He was there until February 27, 2017 (a month *after* he filed his original complaint), when he was moved to housing unit SO/_E, cell _E27/LO. Id. Lannoye's declaration confirms this. Dkt. No. 103 at ¶22. The record shows the plaintiff returned to tier G on August 25, 2017, where he remained through and beyond November 2017—the date he filed his amended complaint. Dkt. No. 107-1 at 6. Again, Lannoye's declaration confirms this. Dkt. No. 103 at ¶¶27-28.

In the amended complaint, the plaintiff asserted that "[a]n accommodation to another cell was made to [him] in Feb 2017, but [he] had to decline, it was against a Medical restriction at that time." Dkt. No. 27 at 6. The defendants agree that they offered accommodations. They indicated that because of the plaintiff's complaints about the lights, "Lannoye offered to have [the plaintiff] moved to a cell where the lights were further away from the wall-mounted lights but [the plaintiff] was resistive to the offers and said he should not have to move;" the defendants don't say when Lannoye made this offer. Dkt. No. 100 at ¶32. The defendants recounted that in "early February 2017," staff members offered to move the plaintiff to a cell on H tier, but that he refused. Id. at ¶33. Cromwell attached to his declaration a letter dated February 3, 2017 from him to the plaintiff. Dkt. No. 102-3. In that letter, Cromwell said that he'd received correspondence from the plaintiff "regarding cell movement." Id. The letter indicated that the plaintiff had been offered "a single cell on H tier after [Cromwell] reviewed [the plaintiff's] previous

26

correspondence, and [Cromwell] was informed [the plaintiff] refused this cell." Id. Cromwell indicated that because there was no documentation of a medical restriction, Cromwell didn't think it was justifiable to put the plaintiff in another single cell on G tier. Id.

The plaintiff has asserted that he declined the offer to move in early February 2017 because of a medical restriction. Cromwell explained in his declaration that at that time, the plaintiff was in cell G17. Dkt. No. 102 at ¶21. The offer proposed to move the plaintiff to "another single cell, H34, on H tier." Id. Cromwell confirmed that the plaintiff refused the offer "due to an alleged medical restriction that would prevent his placement on H tier." Id. Cromwell stated, however, that he contacted the health services unit to confirm the alleged medical restriction, but "was informed that [the plaintiff] had no such medical restriction." Id. Cromwell says the only "restriction" that might have applied to the plaintiff would have been a "low tier" restriction, which would have required the plaintiff to be housed on the first or second levels of the prison (tier E or F), but that the plaintiff didn't have a low tier restriction. Id.

Cromwell stated in his declaration that on February 27, 2017, a bed became available on E tier, and "staff determined that [the plaintiff] should be moved to cell E37 on E tier (first level) to accommodate complaints relating to the wall lights." Dkt. No. 102 at ¶24. Cromwell indicated that "[i]n cell E37, [the plaintiff] was not in close proximity to the wall lights." Id. Cromwell stated that five months later, however, on August 25, 2017, the plaintiff chose to move to a third-level cell, cell 57 on G tier, "in order to have a single cell, even though he

would be in closer proximity to the wall lights in cell G57, than in cell E63." Id.
at ¶25. The bed assignment list (provided by both the plaintiff and the
defendants) shows that on February 27, 2017 the plaintiff was moved from
_G17/LO to _E37/LO. Dkt. No. 107-1 at 6. It also shows that on August 25,
2017, the plaintiff moved from _E63/LO to _G57/LO. Id.

In his declaration, the plaintiff asserted that by December 2016, his
C.O.P.D. (chronic obstructive pulmonary disease) "would not allow [him] to
climb any higher than G tier or C tier they became [his] normal Lo-tier as
evidence enclosed shows." Dkt. No. 108 at 3. He stated that "C-tier became low
tier." Id. The plaintiff also asserted that when he "was in cells E-48, E-37, E-69,
[the plaintiff] had no issues with the lights." Id.

### 4. *The Plaintiff's Grievances and the Conduct Report*

On January 17, 2017, the Inmate Complaint Examiner's office received
complaint GBCI-2017-1621. Dkt. No. 101-6 at 10. The plaintiff signed the
complaint on January 12, 2017, and indicated that the "incident" took place on
January 3, 2017 at 6:00 a.m. Id. The plaintiff asserted that a correction officer
named Gonnering had turned on the wall lights, claiming he could not see,
even though the plaintiff said "we could see clearly." Id. The plaintiff asserted
that he wrote to Cromwell about the incident, that he'd asked Cole and another
corrections officer to the turn the lights off when it was light, and that
Gonnring was the only person claiming he couldn't see and was using the
lights to harass the plaintiff. Id. The plaintiff stated that he'd filed two other

complaints about the same issue. Id. Cromwell responded on January 24, 2017:

> I received multiple correspondences from you regarding the use of the wall lights in the cell hall. As I previously noted, these lights are used for both staff and inmate safety in the morning as well as in the evening. I have discussed the use of these lights with the cell hall staff, and we continue to work on consistency in utilizing these lights. As with any new initiative, I appreciation your patience as we move forward.

Id. at 12.

While doing rounds on January 21, 2017, Sergeant Rozmarynoski (not a defendant) saw that the plaintiff had taped several pieces of paper on his cell door. Dkt. No. 100 at ¶66. When she asked the plaintiff to remove the paper, the plaintiff told her that Cromwell said he that it was "okay" to put the papers on the door until the wall lights were turned off. Id. Eventually the plaintiff complied with Rozmarynoski's request and removed the paper. Id. at ¶67; Dkt. No. 106-1 at 18, Tr. Page 71. Rozmarynoski expressed skepticism that Cromwell approved of the plaintiff violating the cell hall rules, and said she'd be checking with Cromwell to confirm what the plaintiff had said. The plaintiff "replied, 'you do that, because I'm going to write you up, just wait until I talk to the warden about you.'" Dkt. No. 100 at ¶68. Three days later, Rozmarynoski issued a conduct report citing the plaintiff for disobeying orders and lying about an employee. Id. at ¶65. As a result of the conduct report, the plaintiff was confined to his cell for fourteen days, which according to both the plaintiff and the defendants was considered a "minor ticket." Id. at ¶65; Dkt. No. 106-1 at 5, Tr. Page 18.

In the amended complaint, the plaintiff alleged that Cromwell retaliated against him for filing grievances by "allowing [the plaintiff] to receive the ticket by Sgt. Rozmarynoski in Jan 2017." Dkt. No. 27 at 4. He said that all he did to get the ticket "was to put a small piece of paper on my door to block the light for [his] eyes." Id.

In his declaration, the plaintiff said that Rozmarynoski's ticket "[said] it all, she contacted Cromwell, and he did not tell her not to write the ticket [the plaintiff] received on G-17 cell." Dkt. No. 108 at 4. The plaintiff asserted that "[a]ll Cromwell had to say when he seen [the plaintiff] with that the paper hanging there, you will still get a ticket if that is there when other staff walk by, he did not say anything, all he did was smile." Id.

In his brief in opposition to the defendants' summary judgment motion, the plaintiff argued that Cromwell could have told Rozmarynoski not to issue the conduct report. Dkt. No. 110 at 4. The plaintiff said that Cromwell didn't do this, even though he "knew [the plaintiff] was in pain because [Cromwell] had a discussion with [the plaintiff] several times about the lights and the [inmate complaints] that were filed and those lights, DAI policy clearly states that no staff member may retailate [sic] if inmate complaints are filed on the party's." Id. The plaintiff asserted that several complaints were filed and were pending. Id.

The defendants agree that Rozmarynoski contacted Cromwell by email, and that Cromwell told her that he hadn't given the plaintiff permission to put paper on his cell. Dkt. No. 100 at ¶70. They provided Cromwell's email

response, in which he told Rozmarynoski that he "never gave [the plaintiff] permission to attach papers to his cell front" and advising Rozmarynoski that if she liked, "a conduct report would not be out of the question as he was both violating cell hall rules and lying to staff." Dkt. No. 102-1. The defendants stated that in her declaration, Rozmarynoski attested that she was not aware of any inmate complaints filed by the plaintiff at the time she wrote the conduct report and that she would have written it anyway, because taping up paper was a violation of the cell hall rules.[10] Dkt. No. 100 at ¶¶73-74. Cromwell attested in his declaration that he did not have the authority to order Rozmarynoski to issue a conduct report, though he noted that he did think the conduct report was warranted given the circumstances. Dkt. No. 102 at ¶19.

On February 9, 2017, the complaint examiner's office received another complaint from the plaintiff; he had signed it on February 8, 2017, describing an incident that happened the same day. Dkt. No. 101-7 at 6-7. Complaint GBCI-2017-4367 indicated that he had written to Cromwell, who refused to move the plaintiff to G-34, "instead he said he would move [the plaintiff] to H-34." Id. at 6. The plaintiff asserted that cell G-34 had come open "the same day H-34 was going to be made available," but that Cromwell wouldn't place him there. Id. The plaintiff complaint that because of his medical condition (COPD, bad knees, high blood pressure and sensitive eyes), he could not climb any higher than the third level, "either G or C tier's." Id. The complaint also stated

---

[10] The defendants referenced Rozmarynoski's declaration, but don't appear to have provided the declaration to the court.

that the plaintiff had told "Captain Stevens that the old Doctor before she left took all my restrictions away from me and the problems are still there." Id. at 6-7.

When the E tier cell became available on February 27, 2017, staff decided to move the plaintiff there "to accommodate [the plaintiff's] complaints relating to the wall lights." Dkt. No. 100 at ¶85.

B.    Discussion

The plaintiff has alleged that all the defendants violated his Eighth Amendment to humane conditions of confinement by subjecting him to the wall lights. The plaintiff also claims that Cromwell violated his First Amendment rights, alleging that Cromwell retaliated against him for filing grievances about the lights when he refused to prevent Rozmarynoski from giving the plaintiff a conduct report for putting paper over his cell door window.

1.    *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

 2. *Analysis*

 a. Eighth Amendment Conditions of Confinement Claim

To establish an Eighth Amendment violation for a jail or prison's conditions of confinement, a plaintiff must show there was (1) "a deprivation that is, from an objective standpoint, sufficiently serious that it results 'in the denial of the minimal civilized measures of life's necessities,'" and (2) that prison officials were deliberately indifferent to the conditions that caused the deprivation. Gray v. Hardy, 826 F.3d 1000, 1005 (7th Cir. 2016) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). The plaintiff must show that the deprivation was an "extreme deprivation[]." Cole v. Caul, No. 08-cv-695, 2010 WL 3860375 at *8 (E.D. Wis. Sept. 30, 2010) (quoting Delaney v. DeTella, 256 F.3d 679, 683 (7th Cir. 2001)). "Mere discomfort is not sufficient."

Mathews v. Raemisch, No. 10-cv-742, 2012 WL 12888031 at *8 (W.D. Wis. Feb. 23, 2012) (citing Hudson v. McMilliam, 503 U.S. 1, 8-9 (1992)). A plaintiff can show that prison officials were deliberately indifferent to such deprivations where the evidence shows that the officials had "knowledge of the condition but refuse[d] to take steps to correct it." Id. (quoting Dixon v. Godinez, 114 F.3d 640, 645 (7th Cir. 1997)).

In 1996, the Ninth Circuit Court of Appeals stated that "[t]here is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional." Keenan v. Hall, 83 F.3d 1083, 1090 (9th Cir. 1996) (quoting LeMaire v. Maass, 745 F. Supp. 623, 636 (D. Or. 1990), vacated on other grounds, 12 F.3d 1444, 1458-59 (9th Cir. 1993)). The plaintiff in Keenan alleged "that large fluorescent lights directly in front of and behind his cell shone into his cell 24 hours a day, so that his cell was 'constantly illuminated, and [Keenan] had no way of telling night or day,' and that this condition caused him 'grave sleeping problems' and other mental and psychological problems." Id. at 1091. The Ninth Circuit concluded that the plaintiff had produced sufficient evidence to make his lighting claim a disputed issue of material fact not subject to summary judgment," and reversed the grant of summary judgment. Id.

The Seventh Circuit has not addressed whether lights outside an inmate's cell that are on for less than twenty-four hours a day create an extreme deprivation. The court *has* held that "24-hour lighting involving a

single, 9-watt fluorescent bulb does not objectively constitute an 'extreme deprivation.'" Vasquez v. Frank, 290 Fed. App'x 927, 929 (7th Cir. 2008) (citation omitted).

Several district courts within the Seventh Circuit have addressed claims that lights constitute unconstitutional conditions of confinement. In Passmore v. Josephson, 376 F. Supp. 874, 887 (N.D. Ill. 2019), the Northern District of Illinois granted summary judgment in favor of the defendants on the plaintiff's claim that the lights stayed on all night (and that the staff would slam doors), giving him a headache. In Wheeler v. Godinez, No. 13-cv-964, 2016 WL 5394385, at *1 (S.D. Ill. Sept. 27, 2016), the plaintiff alleged that "gallery lights" left on all the time violated his constitutional rights. The court for the Southern District of Illinois granted summary judgment in favor of the defendants, finding that even though the lights were on continuously, the plaintiff could "diminish the amount of light shining in his cell." Id. at *2. In Allen v. Hardy, No. 11 C 4147, 2012 WL 5363415, at *8 (N.D. Ill. Oct. 26, 2012), the district court for the Northern District of Illinois concluded that the plaintiff's claims that "cell house lights . . . beaming on high beams 24 hours a day" did not constitute a sufficiently serious deprivation when the plaintiff did not prove that the lights kept him from sleeping. The Western District of Wisconsin granted summary judgment in favor of the defendants where a plaintiff claimed that his cell was lit twenty-four hours a day, giving him trouble sleeping and causing headaches, sore eyes and blurred vision. King v. Frank, 371 F. Supp. 2d 977, 984 (W.D. Wis. 2005). The court held that "[t]he

only light in his cell that plaintiff does not have the power to turn off is a 9-watt fluorescent light that remains lit at all times to allow prison officials to observe inmates at night." Id. at 985. The court found no evidence that the plaintiff's medical problems were the result of that light. Id.

One court in this district has granted summary judgment in favor of defendants on a plaintiff's claim that lighting created unconstitutional conditions of confinement. In 2009, Judge Adelman noted that "[a]n environment of constant illumination may violate the Eighth Amendment if it causes sleep deprivation or leads to other serious physical or mental health problems." McBride v. Frank, No. 05C1058, 2009 WL 2591618, at *4 (E.D. Wis. Aug. 21, 2009) (citing Keenan v. Hall, 83 F.3d 1083, 1091 (9th Cir. 1996) and King v. Frank, 371 F.Supp.2d 977, 984-85 (W.D. Wis. May 26, 2005)). The plaintiff had alleged that the defendants (staff at Waupun Correctional Institution, one of the places the plaintiff has been confined in the past) illuminated cells in segregation at all time with a 9-watt tube fluorescent light. Id. at *1. Judge Adelman concluded that the plaintiff had not demonstrated that the constant illumination was for the purpose of harassment, and that he'd proven no mental or physical harm caused by the constant illumination. Id. at *5.

In this case, the plaintiff was—for some period between December 2016 and February 27, 2017—in cell G17, which was in an area with wall lights containing 300-watt bulbs with diffuser lenses. He was again in that area from August 2017 through the date he filed his amended complaint. The wall lights

were not in the inmate cells and were not on twenty-four hours a day. The plaintiff has presented no evidence (other than his own assertions) to rebut the defendants' evidence that the lights were not used to harass inmates, but to add visibility in dark areas like stairwells and catwalks and on days and times when there was less natural light coming into the unit.

Cromwell stated in his declaration that no other staff or inmates reported health issues from the wall lights. Dkt. No. 102 at ¶28. Lannoye attested that no staff had complained about the lights, dkt. no. 103 at ¶17, as did Yang, dkt. no. 104 at ¶8. The plaintiff has alleged multiple times that he believed that inmates Kevin Moore and Shannon Rogers complained about the lights, and he demanded that the court require the defendants to produce any inmate grievances filed by those inmates. But the court's scheduling order, issued August 14, 2018, set a deadline of February 18, 2019 for the parties to file dispositive motions. Dkt. No. 57. The court extended that deadline (at the defendants' request) to May 20, 2019. Dkt. No. 88. That means that the plaintiff had *nine months* to obtain affidavits or declarations from any inmates who may have suffered from the lights. He did not do so. He has produced no evidence that anyone other than himself complained about the lights, and the defendants have produced Cromwell's email to Rozmarynoski stating that the plaintiff was the only person who complained about them. Dkt. No. 102-1.

The plaintiff has presented no evidence that the lights prevented him from sleeping. In his deposition, he testified that the lights usually were off by the time he went to bed. Dkt. No. 106-1 at 10, Tr. Page 38. This comports with

Lannoye's declaration that the lights usually were turned off by around 10:00 p.m. Dkt. No. 103 at ¶15. Nor has the plaintiff presented *evidence* that the lights caused damage to his eyes, light sensitivity or migraines. The plaintiff has *alleged* that the lights caused all these problems. But the *evidence* does not support those allegations. The defendants have presented evidence that the plaintiff had complained of migraines in November 2016—before the defendants started using the wall lights. None of the medical records indicate that the plaintiff complained that the wall lights caused any of his medical issues, and the plaintiff admitted in his deposition that he didn't tell any of the medical staff that the lights caused his light sensitivity, eye problems or headaches.

Nor has the plaintiff presented evidence that the defendants were deliberately indifferent to his complaints about the lights. Where lighting conditions cause an "extreme deprivation," the defendant prison officials do not violate the Eighth Amendment if they reasonably respond to the inmate complaints about the conditions. Mathews v. Raemisch, 513 Fed.Appx. 605, 607 (7th Cir. 2013).

On January 24, 2017—after the plaintiff filed his first inmate complaint—Cromwell wrote the plaintiff, acknowledging that he'd received "multiple" letters from the plaintiff about the wall lights, reiterating why staff used the lights, explaining that he'd discussed the lights with staff and that "we continue to work on consistency in utilizing these lights." Dkt. No. 102-2. Cromwell asked for the plaintiff's patience as the staff moved forward. Id.

Sometime between January 24, 2017 and February 3, 2017, staff offered to move the plaintiff to a cell on H tier. The plaintiff refused, claiming that he had a restriction; the defendants could find no such restriction. Nonetheless, when a cell opened on E tier on February 27, 2017, staff moved the plaintiff to that cell. The plaintiff could have stayed in the E tier cell, according to Lannoye, but on August 25, 2017, he chose to be reassigned to a G tier cell so that he could have a single cell. Dkt. No. 103 at ¶27.

In June 2017, the plaintiff saw an eye doctor, who gave him tinted glasses. Dkt. No. 100 at ¶102. The plaintiff admits those glasses provided him relief from the lights. Dkt. No. 106-1 at 14, Tr. Page 54.

The plaintiff has not presented evidence that the lighting constituted an "extreme" deprivation. He has not presented evidence that the lighting caused him to lose sleep, or that it caused his photosensitivity or migraines. He has not presented evidence that the defendants ignored his complaints—he has not demonstrated that they were "deliberately indifferent" to his complaints.

No reasonable jury could conclude that the defendants' use of the wall lights violated the plaintiff's Eighth Amendment rights. The court will grant summary judgment in favor of the defendants on this claim.

b.    First Amendment Retaliation Claim Against Cromwell

The plaintiff alleges that Cromwell violated his First Amendment rights by retaliating against him for filing complaints and grievances about the lights. The plaintiff claims that Cromwell "retaliated" by telling Rozmarynoski that he hadn't given the plaintiff permission to put paper on his door, and by failing to

prevent her from filing a conduct report about the paper. On a First Amendment retaliation claim, the plaintiff has the initial burden to show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." Hawkins v. Mitchell, 756 F.3d 983, 996 (7th Cir. 2014). If the plaintiff successfully demonstrates these things, the burden shifts to the defendant to show that the adverse action would have occurred anyway, despite the existence of protected speech. Mays v. Springborn, 719 F.3d 631, 634 (7th Cir. 2013). If the defendant demonstrates that the adverse action would have occurred anyway, "the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." Thayer v. Chiczewski, 705 F.3d 237, 252 (7th Cir. 2012).

There is no dispute that the plaintiff wrote letters and filed inmate complaints regarding the use of the wall lights. Dkt. No. 100 at ¶61. "Grievances addressed to a government agency, are, if intelligible, nonfrivolous, and nonmalicious, petitions for the redress of grievances within the meaning of the First Amendment and are therefore prima facie protected by the amendment." Hughes v. Scott, 816 F.3d 955, 956 (7th Cir. 2016). The plaintiff has demonstrated that he engaged in conduct protected by the First Amendment—filing grievances.

The plaintiff claims that he suffered a deprivation—he received fourteen days' confinement to his cell as a result of Rozmarynoski issuing the conduct

report. The court will assume that being disciplined and received a fourteen-day confinement sanction constitutes a deprivation.

No reasonable jury could find, however, that the plaintiff's complaints about the lights were a motivating factor in his being sanctioned. Rozmarynoski personally saw the paper on the plaintiff's cell door. She asked him about it, and he claimed Cromwell had told him it was okay. Rozmarynoski contacted Cromwell and learned otherwise. The plaintiff has not disputed that he violated cell living rules by putting up the paper—in fact, when she told him to take it down, he did. He has not disputed that he lied to Rozmarynoski about Cromwell telling him it was okay to do so. He has not presented evidence showing that the conduct report or the discipline were unwarranted. Rather, he argues that, because Cromwell knew the plaintiff had complained about the lights, Cromwell shouldn't have told Rozmarynoski the truth, or should have prevented her from issuing the conduct report. This argument borders on frivolous, and ignores the defendants' declaration that Rozmarynoski didn't know about the plaintiff's grievances and that Cromwell didn't have the authority to prevent her from issuing the conduct report. It also fails to address the defendants' contention that Rozmarynoski issued the conduct report based on her personal observation of rules violations and that she would have issued it regardless of whether she knew the plaintiff had filed grievances. Dkt. No. 100 at ¶¶65, 73-74.

The court will grant summary judgment in favor of Cromwell on the retaliation claim.

41

## V.     CONCLUSION

The court **DENIES as unnecessary** the plaintiff's motion to file a response to the defendants' answer to the amended complaint. Dkt. No. 92.

The court **DENIES** the plaintiff's motions to compel. Dkt. Nos. 93, 112.

The court **DENIES** the plaintiff's motion for discovery. Dkt. No. 96.

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 107.

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 98.

The court **DISMISSES** this case and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil

Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 28th day of February, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**